IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Case No. 6:70-cv-5176 |
| | § | |
| TYLER INDEPENDENT SCHOOL | § | |
| DISTRICT, *et al.*, | § | |
| | § | |
| Defendants | § | |

**ORDER GRANTING JOINT MOTION FOR DECLARATION OF UNITARY STATUS AND DISMISSAL IN THE CASE OF TYLER INDEPENDENT SCHOOL DISTRICT**

Now before the Court is the parties' Joint Motion for Declaration of Unitary Status and Dismissal (Doc. No. 68) (the "Joint Motion") of this action, a 46-year old desegregation case against the Tyler Independent School District ("TISD"). For the reasons stated herein, the Joint Motion is **GRANTED**, the TISD is **DECLARED UNITARY** and this action is **DISMISSED**.

**I.     BACKGROUND**

The United States brought this action on July 15, 1970, seeking an order directing desegregation within the TISD. *See* original Complaint dated July 15, 1970. Aside from TISD itself, the other named Defendants included TISD's Board of Trustees, its members, its President, and the Superintendent of Schools. The Court, the Honorable William Wayne Justice then presiding,[1] issued an Order on July 27, 1970,[2] accompanied by separate Findings of Fact

---

[1] Judge Justice presided over this case until January 28, 2002, when it was transferred to the Honorable T. John Ward. The case was later transferred to the undersigned District Judge on October 17, 2011.

[2] The Complaint, the July 27, 1970, Order, and other filings were originally entered on the Court's paper-based docket from 1970 until October 16, 1998 (with an entry for a Compliance Report of Tyler ISD), when the Court transitioned to its current electronic docketing system, CM/ECF. Docket entries from 1997 and beyond are filed electronically. Where the Court cites a

and Conclusions of Law, enjoining all Defendants "from failing or refusing to afford equal educational opportunities to all students in the Tyler Independent School District without regard to race," and directing the immediate implementation of the then-Department of Health, Education, and Welfare's Plan No. 1.

The case was closed for administrative purposes on August 3, 1976, but the Court retained jurisdiction to monitor compliance efforts through TISD's semi-annual Compliance Reports and for the purpose of ruling on motions for modifications of the original Order. That Order has been modified several times, most recently in an Agreed Order Modifying Plan of Desegregation and Approving Construction and Boundary Modifications issued December 12, 2013 (Doc. No. 54), which among other things approved the construction of the Three Lakes Parkway Middle School.[3] TISD has continued to file semi-annual Compliance Reports documenting its progress under the desegregation Order, most recently on April 14, 2016. (Doc. No. 62.)

When the Court was advised recently that a motion would be filed, the Court initiated a conference call with counsel for all parties on July 19, 2016, and requested that the parties meet and confer on the motion and to determine whether the parties could agree to a Joint Motion for Unitary Status. The Court followed that with an Order Regarding Joint Status Report (Doc. No. 65), providing additional guidance. On August 5, 2016, the parties filed their Joint Status Report and on August 12, 2016, filed their instant Joint Motion.

The Court has jurisdiction to consider the Joint Motion. *Green v. County Sch. Bd. of New Kent Cnty., Va.*, 391 U.S. 430, 439 (1968) (. . . "whatever plan is adopted [in achieving

---

docket entry as "Doc. No. XX," it refers to the electronic docket unless otherwise stated.
[3] *See* the Joint Motion at 1-3 for a review in greater depth of the various modifications of the original Order since 1970.

desegregation] will require evaluation in practice, and the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed." (citations omitted)).

## II. STANDARD

The United States District Court for the Western District of Louisiana recently articulated a succinct statement of the standard of review in desegregation cases:

> When first presented with a school desegregation case, a district court is charged with determining whether or not a school board has maintained or facilitated a dual school system in violation of the Equal Protection Clause of the United States Constitution. U.S. Const., Amend. XIV. If the district court finds such a violation, then under *Brown v. Bd. of Educ. of Topeka, Shawnee Cnty., Kan.,* 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954), and *Brown v. Bd. of Educ.,* 349 U.S. 294, 75 S. Ct. 753, 99 L. Ed. 1083 (1955), the dual system must be dismantled, and the school board must "take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green,* 391 U.S. at 437–38.
>
> Neither a school board's nor a district court's duty ends with the initial desegregation order. Rather, there is a "continuing duty [for school officials] to eliminate the system-wide effects of earlier discrimination and to create a unitary school system untainted by the past." *Ross v. Houston Indep. Sch. Dist.,* 699 F.2d 218, 225 (5th Cir. 1983) (citing *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15, 91 S. Ct. 1267, 28 L. Ed. 2d 554 (1971)). Likewise, the district court "retain[s] jurisdiction until it is clear that state-imposed segregation has been completely removed." *Id.* (citing *Green,* 391 U.S. at 439; *Raney v. Bd. of Educ.,* 391 U.S. 443, 449, 88 S. Ct. 1697, 20 L. Ed. 2d 727 (1968)).
>
> The goal of the district court is to return "schools to the control of local authorities at the earliest practicable date." *Freeman v. Pitts,* 503 U.S. 467, 490, 112 S. Ct. 1430, 118 L. Ed. 2d 108 (1992). In discharging this duty, the district court considers the Supreme Court's "*Green* factors": (1) faculty and staff assignments; (2) transportation; (3) extra-curricular activities; (4) facilities; and (5) student assignments. *Green,* 391 U.S. at 435; *see also Bd. of Educ. of Okla. City Pub. Sch. v. Dowell,* 498 U.S. 237, 250, 111 S. Ct. 630, 112 L. Ed. 2d 715 (1991).
>
> "The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." *Dowell,* 498 at 249–50; *Freeman,* 503 U.S. at 491; *Green,* 391 U.S. at 439; *Ross,* 699 F.2d at 225. To meet its obligation, "[f]or at least three years, the school board must report to the district court." *Monteilh v. St. Landry Parish Sch. Bd.,*

> 848 F.2d 625, 629 (5th Cir. 1988). Further, "the district in question must have for several years operated as a unitary system." *Lemon v. Bossier Parish Sch. Bd.,* 444 F.2d 1400, 1401 (5th Cir.1971). The Court may declare a subject unitary if it determines that the school board has not engaged in any continued racial discrimination and has acted in good faith to maintain its non-discriminatory practices. *See Freeman,* 503 U.S. at 490–91; *see also Price v. Austin Indep. Sch. Dist.,* 945 F.2d 1307, 1314 (5th Cir.1991) (We use the term "unitary" to refer to a school district that "has done all that it could to remedy the [prior] segregation caused by official action .").

*United States v. Franklin Parish Sch. Bd.*, 2013 WL 4017093, at *4-5 (W.D. La. Aug. 6, 2013).

## III. ANALYSIS AND DISCUSSION

As an initial matter, the Court emphasizes again that this Joint Motion represents the parties' substantial efforts together, not only over the years this matter has been pending, but in reviewing the pertinent statistics and evidence here. The fact that it is the parties' joint position that unitary status is warranted in TISD's case and espoused to the Court here carries weight. *See Jones v. Caddo Parish*, 704 F.2d 206, 221 (5th Cir. 1983) ("school desegregation is one of the areas in which voluntary resolution is preferable to full litigation because the spirit of cooperation inherent in good faith settlement is essential to the true long-range success of any desegregation remedy."). The United States, by the Department of Justice, is the Plaintiff here, and there is a presumption that the government properly represents its citizens. *Graham v. Evangeline Parish Sch. Bd.*, 223 F.R.D. 407, 435 (W.D. La. 2004) ("There is a presumption that government institutions represent the interests of the public at large, particularly where the United States is plaintiff in a school desegregation case.") (citation omitted). The TISD has tracked and reported in detail its compliance with the desegregation Order, as modified, for many years and has thus provided the evidence upon which the Court bases its determination.

On that basis, the Court turns to a review of the *Green* factors.

A.   **Student Assignments**

In his Findings of Fact issued concurrently with his original July 27, 1970, Order, Judge Justice found that:

> During the 1969-70 school year, of the 27 schools operated in the Tyler Independent School District, seven had student enrollments that were all black, three had student enrollments that were all white, and 11 had student enrollments in excess of 90% white. The district serves approximately 16,379 students, of whom about 4,727 (29%) are black. Approximately 3,757 (77%) of the black students in the school district are enrolled in the seven all-black schools.

Finding of Fact No. 7; *see also* Complaint at 2. As the parties further acknowledge,

> The District's overall enrollment in 1969-70 was 29.3% Black, 70.0% White, and 0.6% Hispanic. At that time the District had 27 schools, including four all-Black elementary schools, three all-White elementary schools, two all-Black junior high schools, and one all-Black high school.

Joint Motion at 5 (citing original Complaint).

The parties now present graphical statistical summaries tracing the development of TISD's current enrollment by student assignment at each High School, Middle School and Elementary School. On independent review, the Court has compared the summaries to TISD's recent and historical Compliance Reports and confirmed their validity.[4]

One demographic that is immediately apparent is that the number and percentage of Hispanic students enrolled in TISD schools has risen dramatically since 1970, from 0.6% to 37.1% in the 2007-08 school year to 45.7% now. This raises two points. First, as will be seen shortly with the enrollment statistics of black and white students, the enrollment of Hispanic students has been fully included in the desegregation effort throughout the TISD schools. Second, the substantial increase in Hispanic students also has an effect on the relative

---

[4] The Court notes that there are minor variations between the numbers, by race, of students enrolled in TISD's various schools between the summary charts in the Joint Motion and in the most recent Compliance Report filed April 14, 2016 (Doc. No. 62). However, the variations are within the range one might expect over a four-month period and are not material.

5

percentages of black and white student enrollment by school – which are the demographics that were prevalent and were the focus of concern when the 1970 Complaint and Order were filed. That is no impediment to the Court's determination of TISD's unitary status.

A review of the parties' statistical report, Joint Motion at 6-7, and the recent Compliance Report, reveals that there are few schools in any of the grade-level categories that reflect either a higher or lower percentage of student enrollment by race. None is significant when viewing the TISD enrollment statistics overall. Further, as the parties point out, of the eight categories of enrollment showing a somewhat higher or lower percentage compared to the averages for TISD overall, four of them reflect schools that are proceeding under one or the other of the Court's two most recent attendance zone modifications approved in conjunction with the construction and opening of new or renovated schools. Namely, the Rice, Owens and Jack Elementary Schools are addressed in the Court's April 2, 2007, modification (Doc. No. 27) and the Hubbard Middle School was addressed in the Court's December 12, 2013, modification (Doc. No. 54). These coincide with four of the five highest variations from the average, none of which is concerning.

In that light, the Court notes that attaining desegregation does not require perfection in either absolute numbers of students enrolled by race in the various schools or in the statistics used to describe them. As the *Franklin Parish School Board* Court observed,

> The law does not require that all schools in a district be racially balanced as a prerequisite to a unitary status finding. *See Anderson v. Sch. Bd. of Madison Cnty.,* 517 F.3d 292, 298 (5th Cir. 2008). As the Fifth Circuit has explained,
>
>> [t]he constitution does not require school districts to achieve maximum desegregation; that the plan does not result in the most desegregation possible does not mean that the plan is flawed constitutionally. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole. The school board's constitutional duty is to cure the continuing effects of the dual system, not to achieve an ideal racial balance.

> *Monteilh v. St. Landry Parish Sch. Bd.,* 848 F.2d 625, 632 (5th Cir. 1988) (internal quotations and citations omitted). The Court need not employ "'awkward,' 'inconvenient,' or 'even bizarre' measures . . . to achieve racially balanced school assignments 'in the late phases of carrying out a decree, when the imbalance is attributable neither to the prior *de jure* system nor to a later violation by the school district but rather to independent demographic forces.'" *Hull v. Quitman Cnty. Bd. Of Educ.,* 1 F.3d 1450, 1454 (5th Cir.1993) (quoting *Freeman,* 503 U.S. at 493). A school board's affirmative duty does not compel it to adopt the most desegregative student assignment alternative available, but to act in good faith within the practical limitations. *Swann,* 402 U.S. at 18 (citation omitted).

*Franklin Parish Sch. Bd.*, 2013 WL 4017093, at *9. Here, the enrollment statistics convincingly reveal that TISD has achieved the desegregation goal for student assignments in its schools at all levels. Further, having reviewed the statistical compilations from the last several years of TISD's Compliance Reports, the Court finds that TISD has maintained this student assignment status and operated as a unitary system during that period. *Lemon,* 444 F.2d at 1401.

In addition, the parties attest in their Joint Motion that,

> Based on this record, in the area of student assignment, the District has eliminated the vestiges of the former *de jure* dual school system to the extent practicable, has complied with its desegregation obligations for a reasonable period of time, has demonstrated a good faith commitment to the whole of the Court's orders, and is, therefore, entitled to a declaration of unitary status.

Joint Motion at 8. This joint representation by the Plaintiff United States and the Defendant TISD, made as a voluntary resolution of this issue, is preferable to continued litigation due to its spirit of cooperation and long-term, good faith commitment. *Jones v. Caddo Parish*, 704 F.2d at 221. Because it includes the Plaintiff United States, it carries a presumption that the interests of the citizenry are represented. *Graham*, 223 F.R.D. at 435.

Accordingly, the Court declares TISD unitary in the area of student assignments.

### B. Faculty Assignments

The original Complaint in this matter addressed the area of faculty/instructional staff:

> There are seven black principals in the Tyler school system, one in each of the district's all-black schools. During the 1967-68 school year there were 36 teachers employed in schools in which their race was in the minority. In 1968-69 the number increased to 56. Tyler employed 741 full-time professional instructional staff in these years. The pattern of assigning teachers to a school in which their race is in the majority persists through-out the system's 27 schools, and all schools in the system remain racially identifiable by the composition of their faculties.

Original Complaint at 3-4.

The original desegregation Order then required TISD to carry out certain faculty employment management practices, including selecting staff members for dismissal or demotion "on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district"; that no staff vacancies may be filled "through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so"; and, that prior to a reduction of staff, "the school board will develop or require the development of nonracial objective criteria to be used in selecting the staff member who is to be dismissed or demoted," and that such criteria will be made available for public inspection, and that the evaluation of staff members under such criteria will be recorded and preserved. Order at 2.

As in the area of student assignments, above, the parties have proffered statistical evidence of the TISD's ultimate desegregation achievements in the area of faculty assignment, in addition to TISD's semi-annual Compliance Reports. Today, the TISD employs a total of 1157 faculty staff. Joint Motion at 9. As reflected in the student assignment statistics discussed in the section above, there are no longer any all-black schools that would support the limited assignment of black principals. Instead, faculty staff are assigned and distributed throughout the District, without apparent particularized assignments to schools by race. In fact, there are few

8

schools in which the assignment of black or white faculty reflects either a higher or lower relative percentage by race compared to the average. There are variations, but none that is material across TISD. In two middle schools, Boulter and Dogan, that show either a high or low statistical assignment in both the racial categories of black and white faculty, the absolute numbers of such assignments are actually very close together. At Boulter, there are 22 black faculty and 29 white; at Dogan, there are 18 and 21, respectively. The Court cannot identify any practice of segregated assignment of faculty in the District.

Having reviewed past Compliance Reports, the Court finds that TISD has complied with the effort to desegregate in the area of faculty assignments. Further, the parties have attested:

> Based on this record, in the areas of faculty and staff assignment, the District has eliminated the vestiges of the former *de jure* dual school system to the extent practicable, has complied with its desegregation obligations for a reasonable period of time, has demonstrated a good faith commitment to the whole of the Court's orders, and is, therefore, entitled to a declaration of unitary status.

Joint Motion at 9. As in the area of student assignments, such a joint and voluntary resolution by the parties is preferable to continued litigation, *Jones v. Caddo Parish*, 704 F.2d at 221, and carries a presumption that the interests of the citizenry are represented. *Graham*, 223 F.R.D. at 435.

Accordingly, the Court declares TISD unitary in the area of faculty assignments.

**C.     Transportation**

Other than a passing reference in paragraph 8 of his Conclusions of Law and a note in paragraph 18 of his Findings of Fact that "In the Rice – St. Louis and Griffin – Douglas pairing, some modifications of the existing transportation routes and practices will be necessary," Judge Justice's original Order did not explicitly address the issue of transportation. Further, the United States, as Plaintiff, has not brought any concerns to the Court's attention on the issue of

transportation deficiencies over the years. Additionally, no complaints have been received regarding transportation in the context of the desegregation Order. Accordingly, "transportation," as one of the *Green* factors, has not been specifically addressed in TISD's Compliance Reports.

No rigid guidelines exist by which to gauge unitary status with regard to transportation. *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 29-31. One factor to consider, though, is the distance and time of transportation and the possibility of risk to the health of the children transported or an impingement on the educational process itself. *Id*. at 30-31. No such concern has been voiced here. In fact, the Court observes that the sizes of the respective attendance zones within the TISD are not so large as to make such a concern likely.

However, TISD and the United States have affirmatively and jointly stated that:

> The District provides transportation to all eligible students enrolled in the District on a non-discriminatory basis. In the area of transportation, the District has eliminated the vestiges of the former *de jure* dual school system to the extent practicable, has complied with its desegregation obligations for a reasonable period of time, has demonstrated a good faith commitment to the whole of the Court's orders, and is, therefore, entitled to a declaration of unitary status.

Joint Motion at 9. Such a joint and voluntary resolution by the parties is preferable to continued litigation, *Jones v. Caddo Parish*, 704 F.2d at 221, and carries a presumption that public interests are represented. *Graham*, 223 F.R.D. at 435.

Accordingly, the Court declares TISD unitary in the area of transportation.

### D. Extracurricular Activities

Similar to the area of transportation, the original Order does not explicitly address the issue of extracurricular activities. However, it does state,

> Defendants, their employees, agents and successors, and all persons in active concert or participation with any of them are hereby enjoined from failing or refusing to afford equal educational opportunities to all students in the Tyler

Independent School District without regard to race.

Order at 1, ¶ 1. Educational opportunities include extracurricular activities. *Christian Legal Soc. Chapter of the Univ. of California, Hastings College of the Law v. Martinez*, 561 U.S. 661, 686 (2010) ("... extracurricular programs are, today, essential parts of the educational process") (law school context); *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 831, n. 4 (2002)) ("Participation in [extracurricular] activities is a key component of school life, essential in reality for students applying to college, and, for all participants, a significant contributor to the breadth and quality of the educational experience.") (middle and high school context).

As with the area of transportation, no specific concern has been voiced with regard to the availability to students and administration by TISD of extracurricular activities. Extracurricular activities have not been a focus of TISD's semiannual Compliance reports, nor has the United States raised any particular complaint in that area. Instead, the parties have jointly certified that:

> The District provides all students an opportunity to participate in extracurricular activities on a non-discriminatory basis. In the area of extracurricular activities, the District has eliminated the vestiges of the former *de jure* dual school system to the extent practicable, has complied with its desegregation obligations for a reasonable period of time, has demonstrated a good faith commitment to the whole of the Court's orders, and is, therefore, entitled to a declaration of unitary status.

Joint Motion at 9-10. Again, and in the absence of any complaint otherwise, such a joint and voluntary resolution by the parties is preferable to continued litigation, *Jones v. Caddo Parish*, 704 F.2d at 221, and carries a presumption that the interests of the citizenry are represented. *Graham*, 223 F.R.D. at 435.

Accordingly, the Court declares TISD unitary in the area of extracurricular activities.

### E. Facilities

In his original July 27, 1970, Order, Judge Justice directed that:

> All school construction, school consolidation, and site selection (including the location of any temporary classrooms) in the system shall be done in a manner which will prevent the recurrence of the dual school structure once this desegregation plan is implemented.

Order at 3. Over the years, TISD has sought a number of modifications to the original desegregation plan, including the submission of detailed plans and proposals for new school construction, physical plant demolition and/or reconstruction, the placement of temporary buildings, and numerous other projects.[5] *See*, *e.g.*, Doc. Nos. 54 (Agreed Order Modifying Plan of Desegregation and Approving Construction and Boundary Modifications); 27 (Agreed Order Modifying Plan of Desegregation and Approving New Attendance Zones for Rice/Owens/Jack Campuses (April 2, 2007)); 23 (Agreed Order Modifying Plan of Desegregation and Approving School Construction (September 8, 2005, authorizing construction of Rice/Owens relief campus)); 6 (Order authorizing modification to desegregation plan dated June 7, 2001); and earlier motions and orders as reflected on the earlier paper docket of this case.

---

[5] In the case of new school construction or modification of an existing school to incorporate students from other schools, TISD has accompanied its proposals for facilities construction or modification with an incorporated proposal for modification of the pertinent attendance zones. *See*, *e.g.*, the Agreed Order Modifying Plan of Desegregation and Approving New Attendance Zones for Rice/Owens/Jack Campuses (Doc. No. 27) issued by Judge Ward on April 2, 2007. There, TISD and the United States submitted an agreed, joint, plan to modify the attendance zones for Rice, Owens and Jack elementary schools concurrent with the completion of Jack elementary school as the relief campus for Rice and Owens elementary schools. The plan included specific consideration of the effect of the modified attendance zones on the desegregation effort overall. The attendance zones were put into effect, as also reflected in TISD's Compliance Reports (*see*, *e.g.*, Compliance Report dated April 14, 2016, at PageID #6886, reflecting the Rice, Owens & Jack Elementary Schools Attendance Zones, worked out jointly between TISD and the DOJ. These attendance zones are also described on TISD's website, available at http://tylerisd.schoolfusion.us/modules/cms/pages.phtml?pageid=224088 (providing attendance zone charts for TISD's elementary, middle and high schools).). *See also* the Court's discussion of Student Assignments, above.

Likewise, TISD has detailed its facilities management in support of the desegregation Order in its semiannual Compliance Reports. In the April 14, 2016, Compliance Report, TISD traces its facilities management back to the mid-1990s, coinciding in a number of instances with the Orders noted above:

- Current status of portable buildings, their function and location in elementary, middle and high schools, and the eventual drawdown of portable buildings as additional permanent school facilities have been built. (*See* Doc. No. 62, PageID #6881 (status of 159 portable buildings as of October 2013), PageID #6890 (51 portables as of October 2015 due to the 2013 Bond referendum; and, 49 portables remaining at TISD schools as of February 2016, spread between Dogan and Hogg Middle Schools; Tyler and Lee High Schools; St. Louis Early Education Center; and the Jim Plyler Instructional Complex).

- Description and current status of new school facility construction or repurposing, across attendance zones (with modifications to the attendance zones based on well-supported proposals to the Court, which have been approved based on and school levels).

- Development of athletic facilities over time.

- Bond Issues for new construction and renovation across the TISD.

On this setting, the parties attest that:

> The District operates 25 school facilities that are comparable in terms of their structure and utility and provides academic resources, such as computers and other technologies, to students on a non-discriminatory basis. In the area of facilities, the District has eliminated the vestiges of the former *de jure* dual school system to the extent practicable, has complied with its desegregation obligations for a reasonable period of time, has demonstrated a good faith commitment to the whole of the Court's orders, and is, therefore, entitled to a declaration of unitary status.

Joint Motion at 10. Such a joint and voluntary resolution by the parties is preferable to continued litigation, *Jones v. Caddo Parish*, 704 F.2d at 221, and carries a presumption that the interests of the citizenry are represented. *Graham*, 223 F.R.D. at 435.

Accordingly, the Court declares TISD unitary in the area of facilities.

## IV. CONCLUSION

The Court's findings herein, including the concurring stipulations by the Plaintiff United States, evince TISD's good faith compliance with the obligation to eliminate the vestiges of discrimination within the school system.

For these reasons, the parties' Joint Motion for Declaration of Unitary Status and Dismissal (Doc. No. 68) is **GRANTED**. The Tyler Independent School District is **DECLARED UNITARY** in all areas. This case is **DISMISSED**.

**It is SO ORDERED**.

**SIGNED this 26th day of August, 2016.**

_____
MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE